UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMERICAN WHITEWATER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ELECTRON HYDRO, LLC, *et al.*, <br><br> Defendants. | CASE NO. C16-0047-JCC <br><br> ORDER |

This matter comes before the Court on Plaintiff Puyallup Tribe of Indians' ("Puyallup Tribe") and Plaintiffs American Whitewater and American Rivers, Inc.'s ("Conservation Groups") motions for a preliminary injunction. (Dkt. Nos. 35, 41.) Having thoroughly considered the parties' briefing and the relevant record, and finding oral argument unnecessary, the Court hereby GRANTS the Puyallup Tribe's motion (Dkt. No. 35) and DENIES the Conservation Groups' motion (Dkt. No. 41) for the reasons explained herein.

I.  **BACKGROUND**

The Conservation Groups were the first to bring suit in this matter. (*See* Dkt. No. 1.) In 2016, they alleged that Defendants were violating the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B), by operating a hydroelectric dam located along the Puyallup River that took Chinook salmon, steelhead trout, and bull trout ("listed species") without an ESA Section

10(a)(1) incidental take permit. (*Id.* at 7.)[1] The Conservation Groups sought an injunction barring Defendants from continuing to divert water from the Puyallup River into the power generation facility until Defendants acquired incidental take permits from the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS"). (*Id.*) Based on subsequent negotiations, the parties jointly moved to postpone proceedings in the matter while Defendants worked on drafting a Habitat Conservation Plan ("HCP"), a prerequisite to receiving an incidental take permit, and modified the dam's intake structure to reduce or eliminate the incidental take. (Dkt. Nos. 19, 22, 25.)

In-water work on the planned modifications commenced July 2020. (Dkt. No. 50 at 5.) In support of this activity Defendants closed the intake to the power generation facility and constructed a bypass channel. (*Id.*) But Defendants lined the bypass channel with material that broke apart shortly thereafter. (Dkt. No. 47 at 17.) After the bypass channel incident, which is the subject of separate litigation, *see United States v. Electron Hydro LLC*, Case No. C20-1746-JCC (W.D. Wash.), Pierce County issued a Stop Work order to Defendants. (Dkt. No. 50 at 7.) From this point on, Defendants have only been authorized to do emergency stabilization activities and the power intake has remained closed. (Dkt. No. 47 at 18–19, 22–23.)

Defendants anticipate they will receive what they deem to be the requisite federal, state, and local permits this summer to continue modification activities and to again open up the gate for the power intake. (*Id.* at 22–23.) However, Defendants do not believe they require an incidental take permit to resume operations. (*Id.*) As a result, the parties issued a joint status report indicating that, in light of the developments described above, the case is now unlikely to settle. (Dkt. No. 28). They asked the Court to establish new case management deadlines, which the Court did. (*See* Dkt. No. 29.)

The Puyallup Tribe filed its own ESA suit seeking an injunction barring Defendants from

---

[1] The Conservation Groups later filed First and Second Amended Complaints containing similar allegations. (*See* Dkt. Nos. 14, 30.)

opening up the intake without an incidental take permit. *See Puyallup Tribe of Indians v. Electron Hydro, LLC*, Case No. C20-1864-JCC, Dkt. No. 1 (W.D. Wash.). The Court consolidated that matter into the earlier case brought by the Conservation Groups. (*See* Dkt. No. 34.)

Plaintiffs now move for a preliminary injunction barring Defendants from again diverting water to the power generation facility prior to acquiring an incidental take permit. (Dkt. Nos. 35, 41). Plaintiffs argue that if Defendants do so, irreparable harm will occur through the unlawful take of listed species.[2] (*Id.*) Defendants counter that allowing them to operate while they continue to make improvements to the dam is consistent with the Resource Enhancement Agreement that the Puyallup Tribe negotiated with the prior dam owner, Puget Sound Energy, and that the agreement allows for adequate mitigation measures. (Dkt. No. 47 at 6.) Defendants further argue that Plaintiffs have failed to establish that generating power would amount to an unlawful take and, even if it did, they have not demonstrated requisite injury from the take. (*Id.* at 23–27.)[3]

## II. DISCUSSION

### A. Preliminary Injunction – Legal Standard

Ordinarily, a court seeking to determine whether to grant a preliminary injunction considers (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to that party if an injunction is not issued; (3) the extent to which the balance of hardships favors the moving party; and (4) whether the public interest will be advanced by the injunction. *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994); *Los Angeles*

---

[2] Plaintiff American Whitewater also alleges harm based on diminished flows in the approximate 10-mile bypass reach section of the Puyallup River based on harm to their interests in kayaking activities. (*See* Dkt. No. 41 at 2.)

[3] Defendants also argue that the Conservation Groups fail to establish an injury separate to that of the Puyallup Tribe. (Dkt. No. 56.) Because, as described below, the Court finds that the Puyallup Tribe has met its burden to support a preliminary injunction, the Court need not address Defendants' arguments regarding the merits of the Conservation Groups' motion, as that motion is mooted by the Court's ruling on the Puyallup Tribe's motion.

*Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). However, this traditional analysis "does not apply to injunctions issued pursuant to the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (citation omitted). Instead, in cases involving the ESA, Congress has "removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id*. at 793–94 (citation and internal quotation marks omitted). "'Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.'" *Id*. at 794 (quoting *TVA v. Hill*, 437 U.S. 153, 194 (1978)).

Thus, where violations of the ESA are involved, only the first two prongs of the traditional preliminary injunction analysis are at issue. First, plaintiffs must "show either a likelihood of success on the merits, or alternatively, the existence of 'substantial questions' regarding the merits." *Audubon Soc. of Portland v. Nat'l Marine Fisheries Serv.*, 849 F. Supp. 2d 1017, 1033 (D. Or. 2011). Next, plaintiffs must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1348 (D. Mont. 2014) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)) (emphasis in original).

B.  **Incidental Take**

Section 9 of the ESA prohibits the "take" of members of a listed species, which means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1538(a)(1)(B). Section 10 of the ESA gives the governing agency discretion to issue a permit allowing private parties to take a species but only so long as the "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Before an agency can do so, the applicant must submit an HCP showing that it "will, to the maximum extent practicable, minimize and mitigate the impacts of the taking," and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in

the wild." 16 U.S.C. § 1539(a)(2).

It is undisputed that the following listed species are present and spawn in the Puyallup River proximate to Defendant's power station: Chinook salmon, steelhead trout, and bull trout. (Dkt. Nos. 35 at 7, 47 at 9.)[4] It is also undisputed that Defendants have not finalized an HCP and do not possess a valid permit from NFMS or FWS[5] allowing for the incidental take of these species. (Dkt. Nos. 35 at 9, 47 at 15–16.) Therefore, the only real issues are whether the Puyallup Tribe has demonstrated that Defendant's plan to open the gate and draw water from the Puyallup River to generate power would constitute a take and if so whether it is likely to result in irreparable injury.

The Tribe alleges that the following takes would occur if water is again diverted to the power facility: entrainment of listed species in the unscreened flume; deposition of listed species in the forebay, where they would be subject to a variety of harms; and reduced water flows in the bypass reach, resulting in a dewatering of steelhead salmon redds (nests) in the reach. (Dkt. No. 35 at 24–26.)[6] All three represent takes and the Tribe has established by a preponderance of the evidence that all three would occur. *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).

It is undisputed that when the gates are opened to the flume, entrainment of listed species

---

[4] Bull trout, steelhead, and Chinook salmon are listed as species threatened with extinction. *See* 50 C.F.R. § 17.31(a) (2000) (bull trout); Final Protective Regulations for Threatened Puget Sound Steelhead, 73 Fed. Reg. 55,451, 55,455 (Sept. 25, 2008) (steelhead trout); Final Rule Governing Take of 14 Threatened Salmon and Steelhead [ESUs], 65 Fed. Reg. 42,422, 42,475 (July 10, 2000) (Chinook salmon).

[5] NMFS is the governing agency for Chinook salmon and steelhead trout; FWS administers bull trout. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 519 (9th Cir. 2010); *P. Coast Fedn. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1085 (9th Cir. 2005).

[6] The Puyallup Tribe alleges that Defendant's use of a temporary rock dam and its maintenance, or lack thereof, of a fish ladder also constitute a take. (*See* Dkt. No. 35 at 26–27.) But the Court fails to see the connection between these activities and the preliminary injunction sought by the Tribe, which is to "require[e] [Defendants] to keep the [power] intake closed until it has obtained permits under Section 10(a)(1) of the ESA." (*Id.* at 29.) Therefore, the Court need not address the allegations relating to the rock dam or the fish ladder.

occurs. (*See generally* Dkt. Nos. 35, 47.) This is why Defendants are pursuing modifications to the intake structure in the first place. (*See* Dkt. No. 47 at 14 (Defendant's concession that it is undertaking the modifications "solely to exclude fish from [the power facility]").) Nor is there any doubt that this is a take, as it amounts to either a "capture" or "collect[ion]" of a listed species. 16 U.S.C. § 1538(a)(1)(B).[7]

The Puyallup Tribe also presents substantial evidence demonstrating that the resulting deposition of listed species into the forebay harms those species, thereby supporting its assertion that this is a take. The Court found particularly persuasive Donivan Campbell's declaration. (Dkt. No. 53.) He is a former Electron Hydro fish biologist who observed trapping and hauling activities at the forebay from November 2016 through March 2020. (*See id.* at 2–7.) He described in detail the ineffectiveness of the measures used in preserving the fish for transfer back to the river. (*Id.*) The Court also noted with keen interest Russell Ladley's declaration detailing the July 2020 fish salvage efforts in the forebay, which he described as "the worst Electron Forebay fish salvage I have ever witnessed." (Dkt. No. 39 at 6.) This is highly persuasive testimony from someone who has been observing and researching Chinook, steelhead, and bull trout in the Puyallup River for 33 years. (*Id.* at 1–2.)

While it may only remain an issue for a few more months, it is also clear from the evidence presented that opening the gate to the flume would endanger 57 steelhead redds—over 80% of the steelhead redds currently in the Puyallup River above the confluence of the White River. (*See* Dkt. No. 55 at 7–11.) Therefore, this is also a take. Dr. Barrett's countervailing testimony on the issue is unpersuasive. (*See* Dkt. No. 49.)

Defendants counter that the Court's focus should not be on harm, if any, to *individual*

---

[7] Listed species need not be harmed to constitute a take, as "harm" is identified as a separate category of take. 16 U.S.C. § 1538(a)(1)(B); *see Babbitt v. Sweet Home Chapter, Communities for Greater Or.*, 515 U.S. 687, 699 n.11, 702 (1995) (each category of "take" has a distinct meaning); *see also Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 98 (D. Me. 2008) (harmlessly trapping a listed species is a take).

*members* of the listed species but to the species *as a whole*. (*See* Dkt. No. 47 at 24–25.) The Court disagrees. Harm to individual members is sufficient to establish an unlawful take for purposes of an ESA Section 9 case. *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 788 (9th Cir. 1995) (reversing a district court's determination that injury to a single pair of nesting Northern Spotted Owls was not a take as defined in 16 U.S.C. § 1538(a)(1) because the plaintiffs did not allege that the activity would threaten the species as a whole); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996) (finding that a habitat modification significantly impairing the breeding and sheltering nesting of individual Marbled Murrelets is a harm under the ESA).

Moreover, the Tribe presents unrebutted evidence suggesting that Defendants' planned diversion of water from the Puyallup River into the flume, without first acquiring an incidental take permit, represents a threat to the recovery of the *entirety* of the Puyallup Chinook salmon population. (*See* Dkt. Nos. 53, 54, 55.) NMFS previously identified the dam and power generation facility "as the most serious single threat to Chinook salmon in the watershed area . . . containing the primary spawning and freshwater rearing habitats of the Puyallup Chinook salmon population." (Dkt. No. 35-11 at 3.) The Tribe has, by a preponderance of the evidence, established that Defendant's intended plans would constitute an unpermitted and, therefore, unlawful take of Chinook salmon, steelhead trout and bull trout.

### C.  Irreparable Injury

Defendants do not dispute "the important and meaningful relationship between the Tribe and its members and Chinook salmon, steelhead, and Trout." (Dkt. No. 47 at 27.) Yet they argue that the Tribe fails to demonstrate a likelihood of irreparable injury from Defendants' proposed actions. (Dkt. No. 47 at 26–27.) They suggest "[t]he trap and haul operation is effective in capturing fish from the forebay and returning them to the Puyallup River. (*Id.* at 27.) But the evidence the Tribe presents, described above, suggests otherwise. Moreover, this argument does nothing to address the issue of the steelhead redds presently in the bypass reach.

Accordingly, the Court FINDS that the Puyallup Tribe has demonstrated both a likelihood of success on the merits and that irreparable injury is likely in the absence of a preliminary injunction barring Defendants from diverting the Puyallup River into its power generation facility. Based on this finding, the Conservation Groups' motion (Dkt. No. 41) is moot.

The Puyallup Tribe has asked the Court to waive any bond requirements for such an injunction, which the Court agrees is appropriate, given the Tribe's likelihood of success on the merits and Defendants' failure to address the issue in its briefing.

### III. CONCLUSION

For the foregoing reasons, the Puyallup Tribe's motion for a preliminary injunction (Dkt. No. 35) is GRANTED. Defendants must keep the intake to the flume closed until it has obtained permits under Section 10(a)(1) of the ESA. The Conservation Groups' motion (Dkt. No. 41) is DENIED as moot.

DATED this 18th day of June 2021.

John C. Coughenour
UNITED STATES DISTRICT JUDGE